490 So.2d 891 (1986)
Jim E. ARON
v.
PANOLA-QUITMAN GRAIN CORPORATION.
No. 55577.
Supreme Court of Mississippi.
June 4, 1986.
Cliff R. Easley, Yancy, Easley & Cooper, Bruce, for appellant.
Robert H. Broome, Batesville, for appellee.
Before ROY NOBLE LEE, P.J., and PRATHER and ROBERTSON, JJ.
ROY NOBLE LEE, Presiding Justice.
Jim Aron appeals from a judgment in the sum of five thousand three hundred forty-seven dollars twenty-four cents ($5,347.24), entered against him by the Circuit Court of Calhoun County in favor of Panola-Quitman *892 Grain Corporation (Panola-Quitman), on a motion for directed verdict. The sole question presented is whether or not the lower court erred in granting the directed verdict.
On April 13, 1978, appellant went to Panola-Quitman, a grain elevator company engaged in the purchase and sale of soybeans and other grains, and signed four (4) soybean contracts for the delivery to Panola-Quitman of 16,000 bushels of soybeans. The first contract of the same date, provided that appellant deliver unto appellee 7,000 bushels of soybeans in October or November of 1978, for the price of $6.03 per bushel. Appellant then signed the other three contracts in blank to be validated when soybeans reached certain price levels and as authorized by appellant to be inserted in the contracts. The second and third contracts were to become effective when the price increased by 20-cents per bushel intervals. Upon the occurrence of those increases, the second contract was dated May 25, 1978, and provided for the delivery by appellant and acceptance by appellee of 2,000 bushels at $6,23 per bushel. The third contract was dated May 30, 1978, and was for 2,000 bushels at $6.42 per bushel. The fourth contract, dated June 2, 1978, was for 5,000 bushels at $6.35 per bushel.[1]
Each contract contained a seventeen percent (17%) moisture provision and provided appellee/buyer would retain "twenty percent (20%) per bushel until such time as delivery of the soybeans hereby sold are delivered to buyer." The contracts did not contain a clause providing that appellant/seller had the option of applying soybeans, as delivered, to his highest priced contract, e.g., $6.42 per bushel. Nor did the contracts provide that they were the complete and exclusive agreements between the parties.
In the Fall of 1978, appellant made his first delivery of soybeans to Panola-Quitman, which aggregated 1,615 bushels. Panola-Quitman, acting pursuant to its interpretation of the contract, retained 400 bushels of the delivery under the 20% per bushel retention clause, and tendered payment for 1,215 bushels to appellant's delivery agent. Appellant had directed that the beans be applied to his highest contract, which was in the amount of $6.42 per bushel. Panola-Quitman refused to comply with that request, and applied the beans to the first contract entered into April 13, 1978, at $6.03 per bushel.
Appellant telephoned Panola-Quitman and informed the company he was not delivering any more beans; that Panola-Quitman did not have the right to retain 24% of the soybeans; and that Panola-Quitman wrongfully refused to apply the beans to his highest-priced contract, as requested by appellant. Since appellant refused further deliveries, Panola-Quitman was forced to buy beans from other farmers in order to cover its own contract made with Gold-Kist (a/k/a Bunge Corporation) of Marks, Mississippi, on the basis of the Aron contracts. Appellee was required to pay higher prices for those beans and claimed damages in the sum of $5,327.24
The parties here place different interpretations on the meaning of the 20% retainage provision. Appellant contends that the provision means that not more than 20% of each delivery could be retained and, since 400 bushels of the 1,615 bushels were held back, approximately 24 1/2% was retained;[2] and Panola-Quitman violated the contract. Panola-Quitman argues that the 20% provision refers to 20% of 7,000 bushels, the entire quantity on the first contract and that it could have retained up to 1,400 bushels of the 1,615 bushels initially delivered, but chose not to do so.
It is elementary that when the language of a contract is clear and unambiguous, parol testimony is inadmissible to contradict the language of the contract. Smith v. Falke, 474 So.2d 1044 (Miss. 1985). Likewise, *893 parol evidence is inadmissible to vary, alter, add to, or detract from, the instrument, which is clear on its face. On the other hand, parol evidence may be admitted to clarify contract ambiguities by testimony showing intent and interpretation by the parties of those provisions common to the trade or business. Mississippi State Highway Comm'n v. Dixie Contractors, Inc., 375 So.2d 1202 (Miss. 1979). Parol evidence may be introduced to show the intent of the parties which is unclear from the four corners of the instrument. Also, since Panola-Quitman drew the contracts, the provisions thereof will be construed most strongly against appellee. Mississippi State Highway Comm'n v. Dixie Contractors, Inc., supra; Stampley v. Gilbert, 332 So.2d 61 (Miss. 1976).
We note again appellant signed the first contract for 7,000 bushels of soybeans at a price of $6.03 on the 13th day of April, 1978. That contract was complete. The other three contracts were signed on the same date in blank by appellant, and the contracts were dated, filled in for the number of bushels and price, when appellant notified Panola-Quitman that the price then agreed upon was satisfactory.[3] Appellant telephoned that authorization to Panola-Quitman on the other three contracts and No. 2 for 2,000 bushels at $6.23 was dated May 25, 1978, No. 3 for 2,000 bushels at $6.42 was dated May 30, 1978, and No. 4 for 5,000 bushels at $6.35 was dated June 2, 1978. All four contracts were separate and independent and none of them referred to the other contracts. There was no provision which tied together, or integrated, the contracts and none to indicate, in a multiple contract situation, which contract would be performed first or how it would be performed. An identical provision in all four contracts required that the deliveries be made during the calendar months of October-November, 1978.
If we consider all contracts together, as appellee would have, then there is an ambiguity as to which contract should be performed first, since no provision for such performance appears in the contracts. Likewise, there was no requirement for performance until the end of November, 1978. Under the retainage provision, there appears to be an ambiguity as to how and when the retainage should be effected.
The appellant contends that he had the authority to apply his beans to any of the four contracts. Panola-Quitman contends that the first dated contract should be filled first and the other contracts in sequence. Proof of both parties substantiated their positions. Therefore, an issue of fact surrounding the contracts was made, which should have been submitted to the jury under proper instructions. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652 (Miss. 1975). The judgment of the lower court is reversed and the cause is remanded for a new trial.[4]
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER, P.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.

*894 APPENDIX

 BOOKING CONTRACT
 PANOLA-QUITMAN GRAIN CORPORATION
 Route 3, Box 169
 Batesville, Mississippi 38606
 Soybeans (X) wheat (clear) ( ) Other ( )
 In consideration of the mutual promises contained herein: Jim Aron 
(hereafter called SELLER) hereby sells to PANOLA-QUITMAN GRAIN CORPORATION,
Batesville, Mississippi (hereafter called BUYER) and BUYER agrees to
purchase from SELLER 7,000 bushels of soybeans ( ), wheat ( ), other
( ), subject to quanity [sic] adjustment under the Soybean ( ), Wheat
( ), Other ( ) Weight Discount Schedule established and/or in use by the
BUYER and in effect for the current season. SELLER agrees to deliver such
soybeans ( ), wheat ( ), other ( ) to the BUYER at PANOLA-QUITMAN GRAIN
CORPORATION during the calendar month of Oct. Nov. , 1978.
 At time of delivery BUYER agrees to pay SELLER the price of $ 6.03 
per bushel of adjusted weight delivered as established by use of said
soybean ( ), wheat ( ), other ( ) Weight Discount Schedule, less 20 % 
per bushel to be retained by the BUYER until such time as delivery of the
soybeans ( ), wheat ( ), other ( ) hereby sold are delivered to BUYER.
 If soybeans ( ), wheat ( ), other ( ) are tendered under this contract
which have moisture in excess of 17 % BUYER, at BUYER'S option, may
refuse to accept delivery of soybeans ( ), wheat ( ), other ( ) for
application against fulfillment of this contract.
 LIABILITY FOR NON-DELIVERY
 Time is of the essence and if SELLER fails or refuses to make timely
delivery of the soybeans ( ), wheat ( ), other ( ) herein sold, or any
portion thereof, SELLER agrees to pay BUYER as damages for such default,
as to all beans or other grains remaining undelivered, the difference
between the selling price agreed on above and the cash price which BUYER
is offering for soybeans or other grains to which this contract is made on
the last working day of the BUYER of the calendar month in which delivery
is contracted to be made.
 It is agreed tha [sic] the BUYER had recourse for satisfaction of any
damages on any assets owned by the SELLER.
 Garlic or onions in wheat will not be allowed to fill this contract, if
it is made for wheat.
Leinholder [sic] Yes ( ) No ( ) If yes, give name:
__________________________________________
 Accepted this 13 day of April , 1978.
SELLER: /s/ JIM E. ARON BUYER: PANOLA-QUITMAN GRAIN
 CORPORATION
BY: ___________________________ BY: /s/ David Colson 
10-26-78 - 1214.08 Bu
 Contract No. 23 

NOTES
[1] Under the fourth contract, it was agreed that appellant call Panola-Quitman and let it know what he wanted to do when soybean prices were at a level he was satisfied with.
[2] Appellant also claimed he wasn't advised of the 20% retaining provision.
[3] Contract No. 1 is made an appendix hereto and is identical to the other three contracts except for the number of bushels, price per bushel, and date of contract.
[4] This is another one of those cases which the Court has often said, in close questions of fact and law, should be submitted to the jury for decision. In the event the trial judge thinks that the verdict is not founded on the evidence, he could then grant a judgment notwithstanding the verdict and the matter could be finally disposed of in this Court. Such was not done here. Mattina v. Rodolfich, 461 So.2d 751 (Miss. 1984); Reserve Life Ins. Co. v. McGee, 444 So.2d 803 (Miss. 1983); Pittman v. Home Indemnity Co., 411 So.2d 87, 90 n. 3 (Miss. 1982); Weston v. Estate of Lawler, 406 So.2d 31 (Miss. 1981); Jordan v. First National Bank of Jackson, 402 So.2d 845 (Miss. 1981); Claiborne v. Greer, 354 So.2d 1109 (Miss. 1978).